## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

SECOND BAPTIST CHURCH, a Texas )
Non-Profit Corporation )
                                   )      Hon.
      Plaintiff, )       Case No. 5:20-cv-00029
                                     )
     vs. )
                                       )
THE CITY OF SAN ANTONIO, )
a Texas Municipal Organization, )
                                       )
      Defendant. )

### Plaintiff's Verified Complaint for Declaratory Relief, Injunctive Relief and Damages and Jury Demand

Plaintiff, *Second Baptist Church,* by and through its counsel, states the following as its Complaint against Defendant, City of San Antonio, under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), the Texas Religious Freedom Restoration Act ("TRFRA") TEX. CIV. PRAC. & REM. CODE § 110.003 et seq., the Fair Housing Act ("FHA") 42 U.S.C. 3601 et seq, and the Texas Fair Housing Act ("TFHA").

### Parties

1.      Plaintiff Second Baptist Church is a Texas nonprofit corporation with its principal place of business located and maintained at 3310 E. Commerce St. in the City of San Antonio, the County of Bexar and the State of Texas.

2.      Defendant City of San Antonio is a municipality located in Bexar County, Texas and chartered under Texas law.

**Jurisdiction, Request for Advancement on the Court's Calendar, and Venue**

3.     This Court has original subject matter jurisdiction over this case under

   a.   42 U.S.C. § 2000cc-2(f), as this action arises under the laws of the United States;

   b.   28 U.S.C. § 1343(a)(3), as this case is brought to redress deprivations under color of state law, of rights, privileges and immunities secured by the United States Constitution;

   c.   28 U.S.C. § 1343(a)(4), as this case seeks to recover equitable relief under acts of Congress, specifically 42 U.S.C. § 2000cc, which provide causes of actions for the protection of civil and constitutional rights and injunctive remedies;

   d.   28 U.S.C. § 2201(a), as this case seeks declaratory relief under 28 U.S.C. § 2202;

   e.   42 U.S.C. § 1988, to secure reasonable attorney fees as part of the case; and

   f.   supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims asserted herein, as they form part of the same case or controversy as the federal questions.

4.     Plaintiff includes a request for a speedy decision and advancement on this Court's calendar under Fed. R. Civ. P. 57 and 28 U.S.C. § 2201.

5.     The venue in this action is proper within the Western District of Texas pursuant to 28 U.S.C. § 1391(b), in that Defendant is situated within this judicial district, Plaintiff is located within this judicial district, all of the events giving rise to the claims asserted by Plaintiff occurred in this judicial district, and the property that is the subject of the action is situated in this judicial district.

6.     This Court has personal jurisdiction over Defendant as a City and Municipality in the State of Texas.

### Factual Allegations

#### *Second Baptist Church*

7.      Second Baptist Church (hereinafter "SBC" or "Church") is a faith community dedicated to worshipping God according to the directives of the Bible.

8.      The Church was founded in 1879 as Macedonia Baptist Church.

9.      The Church permanently changed its name to Second Baptist Church in 1890.

10.     The Church moved to its current location at 3310 East Commerce Street in 1968 in order to meet the needs of the developing San Antonio community.

11.     The Church is affiliated with the Progressive National Baptist Convention, Inc., American Baptist Convention, and La Grange District Association.

12.     The Church's current pastor, The Rev. Dr. Robert L. Jemerson, began his ministry with the church on September 1, 1993.

13.     Charity, caring for the needy, and ministry to children are central tenants of the Christian tradition, and to the Church in particular.

14.     In accordance with the commands of the Bible and the love of God, the Church believes it is called to welcome the stranger (Leviticus 19:34; Leviticus 24:22; Hebrews 13:2) and obey the Great Commandment (Matthew 22:35-40). As Jesus explained to His disciples, "Whoever receives one such child in my name receives me, and whoever receives me, receives him who sent me." (Mark 9:30-37).

15.     The Church is known for its particular emphasis on community outreach and is called by God to continue and expand its ministries. In particular, the Church, under the leadership of the Rev. Dr. Jemerson, has operated numerous outreach programs over the years, including the following:

    A.  The Homework at Second Baptist program (H.A.S.)

    B.  The Teddy Bear Christmas Tree program

    C.  A Youth Music/Piano Workshop

    D.  An annual Pastor and Family's Christmas Dinner

    E.  School Vacation Day Camps

    F.  A Health Fair for the community

    G.  Student and Teacher Dedication Services

    H.  Marriage Vows Renewal program

    I.  A Youth Dinner Theater

    J.  A Second Baptist Church Library

All of these activities and programs were compelled by the Church's sincerely held religious beliefs and integral to the Church's religious mission.

16.    The Church is blessed to occupy a Property which is ideally suited for the Church's ministry activities.

17.    The Property, located at 3310 East Commerce Street, is improved by several buildings including a sanctuary, a supplemental services building, and a community facility or community center building. The community center includes a banquet hall, a child and adult recreational center, a child and adult learning center, and locker rooms.[1]

18.    The Property looks like this:

---

[1] Photographs of the facilities are attached as **Exhibit 1.**





*Vision Quest and The Migrant Children's Shelter*

19.     Recently, the Church was prayerfully considering how best to utilize the Property, specifically the community center facilities, for its ministry.

20.     With Church membership considering options for use of the Property, God spoke clearly and directed the members to overwhelmingly approve an offer from VisionQuest to lease the Church's Property to use as a shelter for unaccompanied migrant boys.

21.     VisionQuest is a comprehensive youth services organization that adheres to the highest professional standards in providing innovative intervention services to at-risk youth and families. **Exhibit 2, VisionQuest About Us**

22.     The lease is for a period of three years.

23.     The purpose of the proposed shelter is to minister and provide care to unaccompanied children who enter the United States without an adult guardian. **Exhibit 3, ORR Fact Sheet.**

24.     Unaccompanied migrant children are extremely vulnerable, and the shelter would provide a desirable alternative to other facilities where these children might otherwise be sent.

25.     The shelter will accommodate up to 90 boys between the ages of 11-17 for 30-90 days at a time as the children are transitioned to a more permanent home, often with family members in the United States. **Exhibit 4, Verification Letter.**

26.     The shelter is not a detention center.

27.     Rather, the shelter will utilize the Church's ideal facilities to provide the children with educational services, healthcare services, including vision and dental, community engagement, and recreation activities. **Exhibit 4.**

28.     The children will be monitored 24 hours per day for their safety, and the shelter will operate in compliance with all state and federal regulations regarding childcare facilities. **Exhibit 4.**

29.     The shelter will be overseen by an advisory committee of church and community members.

30.     The shelter will be operated with the approval of the Federal Department of Health and Human Services Office of Refugee Resettlement ("ORR"). **Exhibit 4.**

31.     The ORR is the branch of the federal government tasked with helping to provide care and safety to unaccompanied migrant children during their time of transition to family in the United States or a return to their country of origin. **Exhibit 3, ORR Fact Sheet.**

32.     Unaccompanied migrant children leave their country of origin for multiple reasons such as to rejoin family members already in the U.S., to escape abusive family relationships, or to find work to support their families in their country of origin. **Exhibit 3, ORR Fact Sheet.**

33.     The need for shelters for these children is great. As of June 2019 (FY19-YTD), the Department of Homeland Security has referred over 58,500 unaccompanied migrant children to ORR, an increase of over 57 percent from the same time period in FY 2018. **Exhibit 3, ORR Fact Sheet.**

34.     The Church has been called by God and is ideally situated to provide a safe and comfortable facility for these needy and vulnerable children.

35.     Indeed, Jesus himself said "Let the little children come to me, and do not hinder them, for the kingdom of God belongs to such as these." Mark 10:14.

### *The Zoning of the Church Property*

36.     The Church believes the shelter should be permitted by right under the existing zoning but has also filed an application for rezoning to accommodate the City's interpretation of the zoning code.

37.     Zoning in the City is governed by the San Antonio Unified Development Code.

38.     The Church Property is currently zoned AE-3 EP-1 HS MLOD-3 MLR-2.

39.     The base zoning district, which is most relevant for the shelter use, is "Arts and Entertainment 3."

40.     The Property is 5.098 acres along a heavily traveled commercial industrial portion of Commerce Street. **Exhibit 4, Verification Letter.**

41.     Under the current zoning, the Church and the attached supplemental services building are allowed by right. **Id.**

42.     The existing banquet hall, child and adult recreational center, child and adult learning center, and support building, are allowed by right under the current zoning. **Id.**

43.     The Church therefore believes the shelter should be permitted by right under the current zoning.

44.     The Church submitted a request for zoning verification to the City on October 22, 2019 explaining why the shelter should be permitted as of right. **Exhibit 4, Verification Letter.**

45.     The City responded with a letter stating that the shelter was a "human services campus" and thus not permitted by right in the AE-3 base district. **Exhibit 5, City Zoning Verification Response.**

46.     The Church, with VisionQuest, also submitted an application for rezoning with a conditional use for a human services campus on or about September 20, 2019. **Exhibit 6, Rezoning Application.**

47.     The application requested a zoning change of the base district from AE-3 to C-2 Commercial, which would allow operation of a "human services campus." **Id.**

48.     The current and surrounding zoning of the Property is shown in **Exhibit 7, Property Zoning Map.**

49.     The shelter will be accommodated by the existing community center on the Property. **Exhibit 6, Rezoning Application.**

50.     No new buildings will be built on the Property for the shelter use, thus minimizing any potential impact on the surrounding uses. **Id.**

51.     The proposed use is consistent with the Arena District's Community Plan, which designates the site as "Mixed Use." **Id.**

52.     Under San Antonio Unified Development Code Section 35-421, the factors which must be considered for approval of a zoning amendment are:

> **a. Consistency.** The city council does not, on each rezoning hearing, redetermine as an original matter, the city's policy of comprehensive zoning. The city's zoning map shall be respected and not altered for the special benefit of the landowner when the change will cause substantial detriment to the surrounding lands or serve no substantial public purpose.
>
> **b. Adverse Impacts on Neighboring Lands.** The city council shall consider the nature and degree of an adverse impact upon neighboring lands. Lots shall not be rezoned in a way that is substantially inconsistent with the uses of the surrounding area, whether more or less restrictive. Further, the city council finds and determines that vast acreages of single-use zoning produces uniformity with adverse consequences such as traffic congestion, air pollution, and social alienation. Accordingly, rezonings which promote mixed uses subject to a high degree of design control are not necessarily deemed to be inconsistent with neighboring lands and shall be considered.
>
> **c. Suitability as Presently Zoned.** The city council shall consider the suitability or unsuitability of the tract for its use as presently zoned. This factor, like the others, must often be weighed in relation to the other standards, and instances can exist in which the use for which land is zoned may be rezoned upon proof of a real public need or substantially changed conditions in the neighborhood.
>
> **d. Health, Safety and Welfare.** The amendatory ordinance must bear a substantial relationship to the public health, safety, morals or general welfare or protect and preserve historical and cultural places and areas. The rezoning ordinance may be justified, however, if a substantial public need exists, and this is so even if the private owner of the tract will also benefit.
>
> **e. Public Policy.** A strong public policy in favor of the rezoning may be considered. Examples include a need for affordable housing, economic development, or mixed-use development which functionally relates to the surrounding neighborhoods.
>
> **f. Size of Tract.** The city council shall consider the size, shape and characteristics of the tract in relation to the affected neighboring lands. Amendatory ordinances shall not rezone a single city lot when there have been no intervening changes or

other saving characteristic. Proof that a small tract is unsuitable for use as zoned or that there have been substantial changes in the immediate area may justify an amendatory ordinance.

**g. Other Factors.** The city council may consider any other factors relevant to a rezoning application under Texas law.

53.     No single factor is controlling. Instead, each must be weighed in relation to the other standards. Sec. 35-421(f).

### *The City's Political Opposition to the Church's Shelter*

54.     Upon submitting its zoning request to the City, the Church was surprised to encounter vocal opposition to its proposition to provide shelter and care for the migrant children.

55.     Unfortunately, the majority of opposition has come in the form of false statements and political grandstanding.

56.     First, some City politicians have mistakenly labeled the shelter a "detention center" and have attempted to tie the Church to the immigration policies of the President.

57.     Whatever the reason for this mis-labeling, it must be again stated that the shelter is not a detention facility and instead provides a safe and less restrictive alternative to traditional detention facilities. **Exhibit 3, ORR Fact Sheet.**

58.     Mayor Ron Nirenberg stated: "The City will not be an accomplice to establishing another for-profit facility that will detain migrant children indefinitely as the humanitarian crisis at the border continues unresolved." **Exhibit 8, 10/23/19 Rivard Article.**

59.     Of course, the stay of the children at the shelter would not be indefinite and would be capped at 90 days, nor would denying the Church's religious exercise of ministering to the children somehow improve the situation at the border.

60.     City Councilman Manny Peleaz claimed that the Church wants to "operate a prison where poor people's babies will be held against their will[.]" **Exhibit 8, 10/23/19 Rivard Article.**

61.     Again, this statement is obviously factually untrue and is clearly designed to inflame public opinion against the Church's religious exercise of ministering to the children.

62.     City Councilwoman Jada Andrews-Sullivan has stated that "Humanitarian work is a wonderful part of ministry, but is not for a profit[.]" **Exhibit 9, 10/23/19 Express Article.**

63.     These comments advocate for discrimination against the Church's ministry simply because it will be paid for the use of its facilities, implying that the Church's religious exercise is somehow illegitimate.

64.     Further, County Commissioner Tommy Calvert, angered that the Church did not lease the Property to his hand-picked entity, has made numerous false, discriminatory, and inflammatory statements about the Church and its ministry.

65.     Mr. Calvert stated "The children in VisionQuest custody are not free to practice their religion at their home churches, in their own language, and with their families while in custody of VisionQuest." **Exhibit 9, 10/23/19 Express Article.**

66.     Mr. Calvert has also alleged that child abuse may happen at the shelter, **Exhibit 10, 10/1/19 Express Article.**

67.     These inflammatory comments intended to taint the review process stem from the Church's decision to not rent out its Property to another entity hand-picked by Calvert, who is infuriated that God has led the Church in a direction that does not benefit him politically. **See Exhibit 10, 10/1/19 Express Article.**

68.     As shown above, the politicians of San Antonio have tainted the review process of the Church's simple zoning request and are seeking to halt the Church's religious exercise on political and discriminatory grounds.

*The Zoning Commission Recommends Denial*

69.     On November 5, 2019 the San Antonio Zoning Commission held a public hearing regarding the Church and VisionQuest's zoning request. **Exhibit 11, Agenda.**

70.     Neither of the surround neighborhood associations expressed opposition to the shelter. In fact, the Coliseum Willow Park Neighborhood Association is in support of the shelter. **Exhibit 12, Zoning Commission Minutes.**

71.     The City Development Services Staff Memo indicates that many of the hard land-use and planning factors favored approval of the zoning request. **Exhibit 13, Staff Memo.**

72.     Specifically, the Church's requested change to C-2 zoning is consistent with the City's Master Plan for future land use. **Id.**

73.     Staff also found that the C-2 zoning was "appropriate for the surrounding area." **Id.**

74.     Staff also found that the size of the Church's Property was sufficient to accommodate the shelter use. **Id.**

75.     In fact, when the staff memo is reviewed carefully, the only planning and land use factor identified by the staff in favor of denial was the proximity of a commercial use next to nearby residential parcels. **Id.**

76.     This same concern is repackaged and repeated for several of the analysis factors. **Id.**

77.     The recommendation of denial is oddly self-contradictory as staff indicates that the intent of the City is to have the Property be mixed or commercial use in the future, as the Property is ideally suited for it. But unless the City proposes to tear down all the surrounding residential properties, the "concern" regarding proximity to those residential properties will exist for any future use. **See Id.**

78. Despite acknowledging the appropriateness of the Property for the shelter use and the requested zoning, staff recommended denial. **Id.**

79. Many individuals attended the hearing to speak both in support of and in opposition to the shelter. **Exhibit 12, Zoning Commission Minutes.**

80. At the hearing, much of the discussion focused on political issues and grievances rather than land use and planning issues. **Exhibit 14, 11/5/19 Rivard Article.**

81. The discussion that did involve land use and planning centered on the proximity of the Property to residential uses, despite the inconsistencies of that position with the City's Master Plan for future land use. **Id.**

82. Commissioner Patricia Gibbons cautioned her colleagues against making a land use decision based on politics, but her words went largely unheeded. **Id.**

83. Ultimately, the Commission recommended denial of the zoning request by a vote of 8-3.

### The City Council Denies the Zoning Request

84. On December 5, 2019 the San Antonio City Council considered the Church and VisionQuest's zoning request at its weekly meeting.

85. At the meeting, much of the opposition focused on the immigration policies of the federal government, and not the land use and planning aspects of the rezoning request.

86. Ultimately, the City Council voted to deny the rezoning request.

### The City Has Approved Numerous Secularly Owned Shelters

87. Despite the denial of the Church's shelter, the City has approved other shelter uses, some of which are adjacent to residential uses.

88.     There are at least six (6) migrant children shelters already operating in the City, at least one of which is operated by Southwest Key Programs, a secular organization.

89.     Further, there is at least one homeless shelter approved by the City and adjacent to residential uses.

90.     On November 7, 2019, the San Antonio City Council approved a rezoning request to accommodate a human services campus at 4701 Dietrich Road. **Exhibit 15, Dietrich Road Agenda Item.**

91.     The Dietrich Road use was for a low-income housing project with associated services such as laundry. **Id.**

92.     Notably, City staff and the Zoning Commission recommended a zoning change to C-3 commercial despite the fact that the Dietrich Road property was adjacent to residential property on the South and West Sides. **Id.**

93.     The City's denial of the Church's shelter and approval of other secularly owned shelters amounts to treatment on less than equal terms when compared with similarly situated secular comparators, including but not limited to the Dietrich Road Property.

94.     As a result of the City's denial of the Church and VisionQuest's zoning request, the Church is now barred from following God's mandate to use its Property for its religious ministry. Its religious exercise has therefore been substantially burdened.

**COUNT I**
*Violation of the Religious Land Use and Institutionalized Persons Act*
*Substantial Burden Claim - 42 U.S.C. § 2000cc(a)*

95.    Plaintiff restates the allegations in paragraphs 1 through 94 as if fully rewritten herein.

96.    Congress provided in Section 2(a)(1) of RLUIPA statutory protections for "religious exercise" as follows:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution * * * is in furtherance of a compelling government interest [and] is the least restrictive means of furthering that compelling government interest. 42 U.S.C. § 2000cc(a)(1).

97.    While Congress did not define the term "substantial burden" in RLUIPA, Congress defined "religious exercise" to broadly include:

> any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and specifies that the "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose. 42 U.S.C. § 2000cc-5(7).

98.    Congress further directed that RLUIPA should be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

99.    In addition, RLUIPA's drafters noted the need for religious institutions to have the ability to develop "a physical space adequate to their needs and consistent with their theological requirements," which is at the heart of RLUIPA's land use provisions. 146 CONG. REC. S7774-01, 7774 (daily ed. July 27, 2000) (Joint Statement of Sen. Hatch and Sen Kennedy on the Religious Land Use and Institutionalized Persons Act of 2000).

100.    The "substantial burden" provision of RLUIPA applies when (1) the burden is imposed in a program that receives federal financial assistance; (2) the imposition or removal of the burden affects interstate commerce; or (3) the burden is imposed in a system in which a government makes individualized assessments about how to apply a land use regulation. 42 U.S.C. § 2000cc(a)(2)(A), (B), and (C).

101.    Under the Fifth's Circuit's interpretation of RLUIPA, a government places a "substantial burden" on a religious institution when it pressures the adherent to modify his religious behavior and significantly violates his religious beliefs. And, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs. *Adkins v Kaspar*, 393 F.3d 559 (5th Cir. 2004).

102.    The City has applied its Unified Development Code in a manner that substantially burdens the Church's religious exercise since the Church is now banned from using its Property to follow God's mandate to provide a shelter for unaccompanied migrant children.

103.    The City's denial has forced the Church to significantly violate its religious beliefs generally and specifically. The Christian faith generally requires its adherents to care for the poor, needy, and children in particular. Specifically, the Church and its congregation have been called by God due to their unique location, facilities, and resources, to use the Property as a shelter for these unaccompanied migrant children. The City's denial forces the Church to violate this mandate.

104.    The City has engaged in an individualized assessment through its analysis and denial of the requested zoning change and also by the decision to interpret the City's Unified Development Code in such a manner as to not allow the shelter use by right.

105.    The City has thus imposed a "substantial burden" on the Church's religious exercise as set forth in 42 U.S.C. 2000cc(a)(1).

106.    There are no practical alternatives for the Church's mandate to use its Property as a shelter for the unaccompanied migrant children.

107.    The City's denial and imposition of the substantial burden was not the least restrictive means of furthering a compelling government interest.

108.    There is no compelling government interest supporting the City's denial.

109.    Even if there was a compelling government interest to support the City's denial, outright denial was not the least restrictive means of furthering that interest since alternative paths were available to the City.

110.    Accordingly, the City has imposed a "substantial burden" on the Church's rights by denying it the ability to use the Property as a shelter as recognized under 42 USC § 2000cc(a)(1).

111.    As a direct result of the Defendant's violations of the Church's rights protected under 42 USC § 2000cc(a), the Church has suffered damages in excess of $75,000.00.

112.    As a direct result of the City's denial, the Church has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT II
### Violation of the Texas Religious Freedom Restoration Act
### TEX. CIV. PRAC. & REM. CODE § 110.003 et seq

113.     Plaintiff restates the allegations in paragraphs 1 through 112 as if fully rewritten herein.

114.     The Texas Religious Freedom Restoration Act ("TRFRA") prohibits government entities like the City from "substantially burden[ing] a person's free exercise of religion," unless the government can demonstrate that the burden is the "least restrictive means" of furthering a "compelling governmental interest." Tex. Civ. Prac. & Rem. Code Sec. 110.003(a)-(b).

115.     Notably, when interpreting the federal Religious Freedom Restoration Act, the Supreme Court said "RFRA was designed to provide very broad protection for religious liberty," and protects individuals and businesses alike. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2767-69 (2014).

116.     The Fifth Circuit has adopted the following test to determine if there has been a violation of TRFRA: (1) whether the government's regulations burden the plaintiff's free exercise of religion; (2) whether the burden is substantial; (3) whether the regulations further a compelling governmental interest; and (4) whether the regulations are the least restrictive means of furthering that interest. *Merced v. Kasson*, 577 F.3d at 578 (5th Cir. 2009).

117.     The City, through its interpretation of the Unified Development Code and its denial of the zoning request, has substantially burdened the Church's religious exercise because it has prevented the Church from following God's mandate to use the Property as a shelter for the unaccompanied migrant children.

118.     There are no available alternatives for the Church to use the Property as a shelter for the unaccompanied migrant children.

119.    The City's imposition of the substantial burden on the Church's religious exercise is not the least restrictive means of furthering any compelling government interest.

120.    Accordingly, the City has violated TRFRA.

121.    As a direct result of the Defendants' violations of the Church's rights protected under TRFRA, the Church has suffered damages in excess of $75,000.00.

122.    As a direct result of the City's denial, the Church has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

**COUNT III**
*Violation of the Religious Land Use and Institutionalized Persons Act*
*Equal Terms Claim - 42 U.S.C. § 2000cc(b)(1)*
*Facial and As Applied Challenge*

123.    Plaintiff restates the allegations in paragraphs 1 through 122 as if fully rewritten herein.

124.    The Equal Terms provision of RLUIPA states: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

125.    In the Fifth Circuit, a claim under RLUIPA's Equal Terms clause requires a court to determine; (1) the regulatory purpose or zoning criterion behind the regulation at issue, as stated explicitly in the text of the ordinance or regulation; and (2) whether the religious assembly or institution is treated as well as every other nonreligious assembly or institution that is "similarly situated" with respect to the stated purpose or criterion. Where...the religious assembly or institution establishes a prima facie case, the government must affirmatively satisfy this two-part test to bear its burden of persuasion on this element of the plaintiff's Equal Terms Clause claim. *Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279, 292-93 (5th Cir. 2012).

126.     RLUIPA…is less concerned with whether formal differences may be found between religious and non-religious institutions—they almost always can—than with whether, in practical terms, secular and religious institutions are treated equally. *Third Church of Christ, Scientist v. City of N.Y.*, 626 F.3d 667 (2d Cir. 2010).

127.     The Church is a religious assembly or institution who is subject to a land use regulation – the San Antonio Unified Development Code.

128.     Accordingly, the first two prongs of the Equal Terms provision of RLUIPA have been met.

129.     The City has treated the Church's request to operate the shelter on less than equal terms as compared to similarly situated shelters with nonreligious affiliations.

130.     There are homeless shelters located adjacent to residential areas permitted in the City. Further, there is at least one nonreligious operated shelter for unaccompanied migrant children in the City.

131.     The Church has not been treated equally with the permitted nonreligious shelters in the City with respect to the regulatory purpose or zoning criterion under the San Antonio Unified Development Code.

132.     Therefore, the City has violated RLUIPA's Equal Terms provision.

133.     The Church is suffering irreparable harm for which there is no adequate remedy at law and as a direct result of the Defendant's violations of Plaintiff's rights under RLUIPA's Equal Terms Clause, 42 U.S.C. § 2000cc(b)(1), as alleged above.

134.     Furthermore, as a direct result of the City's violations of the Church's rights under RLUIPA's Equal Terms provision as alleged above, Plaintiff has suffered and is entitled to recover damages, equitable relief, costs and attorney fees.

**COUNT IV**
*Violation of the Fair Housing Act*
*42 U.S.C. 3601 et seq.*

135.    Plaintiff restates the allegations in paragraphs 1 through 134 as if fully restated herein.

136.    The Fair Housing Act makes it unlawful to refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, religion, national origin, familial status, and/or handicap. 42 U.S.C. § 3604(a).

137.    "The Fair Housing Act is 'broad and inclusive' in protecting against conduct which interferes with fair housing rights and is subject to 'generous construction.'" *Texas v. Crest Asset Mgmt., Inc.*, 85 F. Supp. 2d 722, 727 (S.D. Tex. 2000).

138.    The phrase "otherwise make unavailable" has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions. *See, e.g., Huntington Branch, National Association For the Advancement of Colored People v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir.), *aff'd*, 488 U.S. 15, 102 L. Ed. 2d 180, 109 S. Ct. 276 (1988) (per curiam).

139.    The City's actions have made the shelter unavailable to the unaccompanied migrant children because of the Church's religious status and the children's race and national origin.

140.    The City's actions are the result of discriminatory intent against the Church as a religious organization and against the children as unaccompanied migrants.

141.    Further, the City's actions have resulted in disparate impact on the Church and the unaccompanied migrant children.

142.    The City's discriminatory intent can be clearly seen through the many bigoted and inflammatory comments by City officials as cited above.

143.     The City's discriminatory intent was a significant factor in the position taken by the City decision-makers in this case.

144.     The disparate impact upon the Church and unaccompanied migrant children was a predictable result of the City's denial of the zoning request for the Church's shelter.

145.     The City has therefore violated the Fair Housing Act by denying the Church and VisionQuest's zoning request to operate the shelter.

146.     The Church is suffering and will continue to suffer irreparable harm as direct result of the City's action.

147.     As a direct result of the City's violations of the Fair Housing Act as alleged above, Plaintiff has suffered and is entitled to recover damages, equitable relief, costs and attorney fees.

## COUNT V
### *Violation of the Texas Fair Housing Act*
### *TEX. PROP. CODE ANN. §§ 301.001-301.171*

148.     Plaintiff restates the allegations in paragraphs 1 through 147 as if fully rewritten herein.

149.     Similar to the federal FHA, the Texas Fair Housing Act ("TFHA") prohibits discrimination in housing based on race, color, religion, sex, familial status, national origin, and handicap.

150.     The TFHA is substantially similar to the federal FHA, and the rights granted under the TRFRA are equivalent to those granted under the federal FHA. *Texas v. Crest Asset Mgmt., Inc.*, 85 F. Supp. 2d 722, 728 (S.D. Tex. 2000) (internal citations omitted).

151.     Therefore, the City has violated the TFHA in the same ways in which it has violated the federal FHA as described above.

152.   As a direct result of Defendant's violation of Plaintiff's rights under the TFHA,

Plaintiff has suffered and is entitled to recover damages, equitable relief, costs and attorney fees.

153.   The Church is also suffering and will continue to suffer irreparable harm as a direct

result of the City's actions.

### Prayer for Relief

WHEREFORE, Plaintiff Second Baptist Church prays for a judgment against Defendant

City of San Antonio, and that this Honorable Court:

    a.  Allow the Church to use its Property for the shelter for unaccompanied migrant children starting immediately;

    b.  Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declaration shall have the force and effect of final judgment and that the Court retains jurisdiction of this matter for the purpose of enforcing the Court's Order;

    c.  Award damages to the Church in excess of $75,000.00;

    d.  Pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000cc-4(d), and other applicable law, award the Church its reasonable attorney fees and costs; and

    e.  Grant such other and further relief, as the Court deems equitable, just and proper.

### Demand for Trial by Jury

Plaintiff herein demands a trial by jury in this cause of action.

Respectfully Submitted,

**Dalton & Tomich PLC**

By: ___/s/ Daniel P. Dalton_____

Daniel P. Dalton (Michigan Bar No. 44056)
Lawrence Opalewski (Michigan Bar No. 77864)
Alexander R. Reuter Michigan Bar No. 80654)
Lead Attorneys for Plaintiff

*Pro Hac Vice* admissions pending
The Chrysler House
719 Griswold Street, Suite 270
Detroit, MI 48226
Tel. (313) 869-6000
ddalton@daltontomich.com
lopalewski@daltontomich.com
areuter@daltontomich.com

and

**FORD/MURRAY, PLLC**

By:  __/s/ S. Mark Murray_____
S. MARK MURRAY
State Bar No. 14729300
10001 Reunion Place, Suite 640
San Antonio, Texas  78216
(210) 731-6400 Telephone
(210) 731-6401 Facsimile
MMurray138@aol.com

Dated: January 7, 2020

**Verification**

Pursuant to 28 U.S.C. §1746, I, The Rev. Dr. Robert L. Jemerson of Second Baptist Church, declare under penalty of perjury, that I have personal knowledge of matters contained in paragraphs 1, 7 through 20, 85, and 94 of this Complaint and that the allegations contained therein are true and accurate.

Executed this this 6th day of December 2019

By: The Rev. Dr. Robert L. Jemerson
Its: Senior Pastor

25