# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | | |
|---|---|---|---|
| SECOND BAPTIST CHURCH, a Texas | ) | | |
| Non-Profit Corporation | ) | | |
| | ) | Hon. David Ezra | |
| Plaintiff, | ) | Case No. 5:20-cv-00029-DAE | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| THE CITY OF SAN ANTONIO, | ) | | |
| a Texas Municipal Organization, | ) | | |
| | ) | | |
| Defendant. | ) | | |

*Plaintiff's First Amended Verified Complaint for Declaratory Relief,*
*Injunctive Relief and Damages*
*and Jury Demand*

Plaintiff, Second Baptist Church, by and through its counsel, states the following as its First Amended Verified Complaint against Defendant, City of San Antonio, under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"); and the Texas Religious Freedom Restoration Act, Tex. Civ. Prac. & Rem. Code § 110.003 *et seq.* ("TRFRA").

## Introduction

Second Baptist Church traces its roots in San Antonio to 1879 when it was known as Macedonia Baptist Church. It has served as Second Baptist Church since 1890. In 1968, the State of Texas took Second Baptist Church's historic property to build a highway, forcing its relocation to its present location. Second Baptist Church installed its current minister, The Rev. Dr. Robert Jemerson, in September of 1993. For the last 27 of the church's 140-year history in San Antonio, The Rev. Dr. Jemerson has focused the church's religious mission upon four core principles:

1. The church must not only provide for the spiritual needs, but also seek lasting solutions for challenges inherent in rebuilding lives and communities.

2. The African American community must develop and put into action creative ways to support and remedy its underserved.

3. It should not be the primary responsibility of government or charity to meet the needs of "God's Visionary People."

4. The times demand that Second Baptist Church continue its quest for excellence in all phases of life, advancing the economic, social and cultural needs of the people.[1]

In association with the American Baptist Church and the Progressive National Baptist Convention, Second Baptist is part of a movement reflecting the religious and social climate of its time. Over the years, Rev. Dr. Jemerson has led Second Baptist to launch numerous religiously-motivated social programs in an effort to meet the needs of its particular community, while teaching the faith central to its religious mission.

Caring for immigrants is central to the religious identity of Second Baptist Church. In the service of this religious identity and mission, the members of Second Baptist Church wish to use the church's facilities to provide practical and spiritual care to immigrant children who find themselves displaced in the United States. Rather than welcome the use of its own church property to alleviate the growing burden of displaced immigrant children upon the city, state, and nation, the City of San Antonio has repeatedly blocked Second Baptist Church's efforts while approving the zoning application for at least one (1) non-religious homeless shelters and welcoming at least six (6) other shelters for immigrant children to operate in the city. More than simply casting a vote

---

[1] *See* Second Baptist Church, "Pastoral Leadership: the Pastoral History of Second Baptist Church," available at http://secondbaptistsat.org/pastoral-leadership/ (last accessed March 31, 2020).

against the use of its property to serve its religious mission, elected officials have ascribed offensive political motives to Second Baptist Church's members.

Thus, the City of San Antonio has prevented, or substantially burdened, Second Baptist Church from using their property for a core religious exercise. If Second Baptist Church is to realize its freedom to use its property to carry out activity integral to its religious identity and mission, its only recourse is the intervention of this Court to apply to the City of San Antonio the laws of the United States and the State of Texas, along with the corresponding guarantees to the freedom of religion found in the U.S. Constitution and the Constitution of the State of Texas.

**Parties**

1.     Plaintiff Second Baptist Church is a Texas nonprofit corporation with its principal place of business located and maintained at 3310 E. Commerce St. in the City of San Antonio, the County of Bexar, and the State of Texas.

2.     Defendant City of San Antonio is a municipality located in Bexar County, Texas, and chartered under Texas law.

**Jurisdiction, Request for Advancement on the Court's Calendar, and Venue**

3.     This Court has original subject matter jurisdiction over this case under

   a.   42 U.S.C. § 2000cc-2(f), as this action arises under the laws of the United States;

   b.   28 U.S.C. § 1343(a)(3), as this case is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution;

   c.   28 U.S.C. § 1343(a)(4), as this case seeks to recover equitable relief under acts of Congress, specifically 42 U.S.C. § 2000cc, which provide causes of actions for the protection of civil and constitutional rights and injunctive remedies;

   d.   28 U.S.C. § 2201(a), as this case seeks declaratory relief under 28 U.S.C. § 2202;

   e.   42 U.S.C. § 1988, to secure reasonable attorney fees as part of the case; and

      f.    supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims asserted herein, as they form part of the same case or controversy as the federal questions.

4.     Plaintiff includes a request for a speedy decision and advancement on this Court's calendar under Fed. R. Civ. P. 57 and 28 U.S.C. § 2201.

5.     The venue in this action is proper within the Western District of Texas pursuant to 28 U.S.C. § 1391(b), in that Defendant is situated within this judicial district, Plaintiff is located within this judicial district, all of the events giving rise to the claims asserted by Plaintiff occurred in this judicial district, and the property that is the subject of the action is situated in this judicial district.

6.     This Court has personal jurisdiction over Defendant as a City and Municipality in the State of Texas.

## Factual Allegations

### *Second Baptist Church*

7.     Second Baptist Church (hereinafter "SBC" or "Church") is a faith community dedicated to worshipping God according to the directives of the Bible.

8.     The Church was founded in 1879 as Macedonia Baptist Church.

9.     The Church permanently changed its name to Second Baptist Church in 1890.

10.    The Church moved to its current location at 3310 East Commerce Street in 1968, two years after the State of Texas notified the congregation that the church would have to vacate their historic property in order for the state to build an expressway over its ruins. After two years of protests and discussions with the State of Texas, the church relocated to its present location where it has labored to meet the needs of the developing San Antonio community for 52-years.

4

11.     The Church is affiliated with the Progressive National Baptist Convention, Inc., American Baptist Convention, and La Grange District Association.

12.     The Church's current pastor, The Rev. Dr. Robert L. Jemerson, began his ministry with the church on September 1, 1993.

13.     Charity, caring for the needy, and ministry to children are central tenets of the Christian tradition, and to the Church in particular.

14.     In accordance with the commands of the Bible and the love of God, the Church believes it is called to welcome the stranger (Leviticus 19:34; Leviticus 24:22; Hebrews 13:2) and obey the Great Commandment (Matthew 22:35-40). As Jesus explained to His disciples, "Whoever receives one such child in my name receives me, and whoever receives me, receives him who sent me." (Mark 9:30-37).

15.     The Church is known for its particular emphasis on community outreach and is called by God to continue and expand its ministries. In particular, the Church, under the leadership of the Rev. Dr. Jemerson, has operated numerous outreach programs over the years, including the following:

      A.  The Homework at Second Baptist program (H.A.S.)

      B.  The Teddy Bear Christmas Tree program

      C.  A Youth Music/Piano Workshop

      D.  An annual Pastor and Family's Christmas Dinner

      E.  School Vacation Day Camps

      F.  A Health Fair for the community

      G.  Student and Teacher Dedication Services

      H.  Marriage Vows Renewal program

  I. A Youth Dinner Theater

  J. A Second Baptist Church Library

All of these activities and programs were motivated by the Church's sincerely held religious beliefs and are integral to the Church's religious mission.

  16. The Church is blessed to occupy a Property ideally suited to the Church's ministry activities.

  17. The Property is improved by several buildings including a sanctuary, a supplemental services building, and a community facility (or community center) building. The community center includes a banquet hall, a child and adult recreational center, a child and adult learning center, and locker rooms.[2]

  18. The Property exterior looks like this:



---

[2] Photographs of the facilities are attached as **Exhibit 1.**



*Vision Quest and The Migrant Children's Shelter*

19.     Recently, the Church prayerfully considered how best to utilize the Property's community center for its ministry.

20.      With Church membership considering options for use of the Property, God spoke clearly to the members of the Church, overwhelmingly directing them to approve an offer from VisionQuest to lease the Church's Property to use as a shelter for unaccompanied migrant boys on or about July 29, 2019.

21.     VisionQuest is a comprehensive youth services organization adhering to the highest professional standards while working with churches like Second Baptist in providing innovative intervention services to at-risk youth and families. **Exhibit 2, VisionQuest About Us**

22.     The lease was for a period of three years.

23.     The purpose of the proposed shelter was to further Second Baptist's religious mission by ministering and providing temporary care to unaccompanied children who enter the United States without an adult guardian. **Exhibit 3, ORR Fact Sheet.**

24.     Unaccompanied migrant children are extremely vulnerable, and the shelter would provide a desirable alternative to other facilities where these children might otherwise be sent.

25.     The shelter would accommodate up to 90 boys between the ages of 11–17 for 30–90 days at a time as the children are transitioned to a more permanent home, often with family members in the United States. **Exhibit 4, Verification Letter.**

26.     The shelter was to provide a tangible means by which the Church achieves its religious mission of caring for immigrants, utilizing ideal facilities to provide the children with educational services; healthcare services, including vision and dental services; community engagement; and recreation activities. **Exhibit 4.**

27.     The children would be monitored 24 hours per day for their safety, and the shelter would operate in compliance with all state and federal regulations regarding childcare facilities temporarily housing immigrant children. **Exhibit 4.**

28.     The shelter would be operated and overseen by an advisory committee of church and community members.

29.     Further, the Church and its members would teach their faith and carry out the religious mission of the church to the children at the shelter.

30.     The Church would engage the immigrant children in Bible study and make other religious activities available to them while in the shelter such as literature, counselling, and religious-themed field trips, including resources available in the Spanish language, and ministers available of the Catholic and Islamic faiths.

31.     These ministry activities are central to and intimately related to the Church's religious mission, as is making its facilities available to these needy children.

32.     The shelter would be operated with the approval of the U.S. Department of Health and Human Services' Office of Refugee Resettlement ("ORR"). **Exhibit 4.**

33.     Whether operated by VisionQuest, another contractor, or the Church itself, the Church believes God has called them to serve the immigrant population by using its Property as a shelter for immigrant children.

34.     The ORR is the agency of the federal government tasked with helping to provide care and safety to unaccompanied migrant children during their time of transition to family in the United States or a return to their country of origin. **Exhibit 3, ORR Fact Sheet.**

35.     Unaccompanied migrant children leave their country of origin for multiple reasons such as to rejoin family members already in the U.S., to escape abusive family relationships, or to find work to support their families in their country of origin. **Exhibit 3, ORR Fact Sheet.**

36.     The need for shelters for these children is overwhelming. As of June 2019 (FY19-YTD), the Department of Homeland Security has referred over 58,500 unaccompanied migrant children to ORR, an increase of over 57 percent from the same time period in FY 2018. **Exhibit 3, ORR Fact Sheet.**

37.     The Church has been called by God, and is ideally situated, to provide a safe and comfortable facility for these needy and vulnerable children.

38.     Indeed, Jesus himself said "Let the little children come to me, and do not hinder them, for the kingdom of God belongs to such as these." Mark 10:14.

39.     Further, the official policy of the General Board of the American Baptist Church, with which the Church is affiliated and which informs the Church's mission, toward immigration reads, in part, as follows:

> Because of the Biblical mandate that we be a caring and hospitable community, that we love our neighbors, that we establish justice and proclaim liberty; because we have a sense of Christian responsibility to serve human needs; because of our commitment to respect

the human rights of all people; and because we are mainly a nation of immigrants, we, the American Baptist Churches USA, shall:

1. Continue our historical role as an advocate of human rights[] for immigrants, refugees, migrants and asylum seekers.

2. Continue our historical role in resettlement of refugees and in assisting immigrants.

3. Continue to partner with Church World Service and cooperate with other religious, volunteer and community agencies in the servicing and resettlement of refugees.

4. Continue to raise the consciousness of the Church and society regarding the needs of refugees and immigrants and their contribution to American society and the Biblical truth that we are all God's children.

5. Engage in wholistic ministry to immigrants, refugees, migrants, asylum seekers and overstayed and undocumented persons in Department of Homeland Security and other detention facilities in the United States and in local communities, offering assistance in such areas as:

    (a) fellowship - establishing social and spiritual community

    (b) worship and evangelism

    (c) civic education

    (d) language training

    (e) counseling - documentation, employment, citizenship, financial, cultural orientation.[3]

---

[3] *See* American Baptist Policy Statement on Immigration and Refugee Policy, https://www.abc-usa.org/wp-content/uploads/2019/02/Immigration-and-Refugee-Policy-2007.pdf (cross reference omitted).

*The Zoning of the Church Property*

40.     The Church believes the shelter should be permitted by right under the existing zoning but has also filed an application for rezoning to accommodate the City's interpretation of the zoning code.

41.     Zoning in the City is governed by the San Antonio Unified Development Code.

42.     The Church Property is currently zoned AE-3 EP-1 HS MLOD-3 MLR-2.

43.     The base zoning district, which is most relevant for the shelter use, is "Arts and Entertainment 3."

44.     The Property is 5.098 acres along a heavily traveled commercial industrial portion of Commerce Street. **Exhibit 4, Verification Letter.**

45.     Under the current zoning, the Church and the attached supplemental services building are allowed by right. **Id.**

46.     The existing banquet hall, child and adult recreational center, child and adult learning center, and support building are allowed by right under the current zoning. **Id.**

47.     The Church therefore believes the shelter should be permitted by right under the current zoning.

48.     The Church submitted a request for zoning verification to the City on October 22, 2019 explaining why the shelter should be permitted as of right. **Exhibit 4, Verification Letter.**

49.     The City responded with a letter stating that the shelter was a "human services campus" and thus not permitted by right in the AE-3 base district. **Exhibit 5, City Zoning Verification Response.**

50.     The Church, with VisionQuest, also submitted an application for rezoning with a conditional use for a human services campus on or about September 20, 2019. **Exhibit 6, Rezoning Application.**

51.     The application requested a zoning change of the base district from AE-3 to C-2 Commercial, which would allow operation of a "human services campus." **Id.**

52.     The current and surrounding zoning of the Property is shown in **Exhibit 7, Property Zoning Map.**

53.     The shelter would be accommodated by the existing community center on the Property. **Exhibit 6, Rezoning Application.**

54.     No new buildings would be built on the Property for the shelter use, thus minimizing any potential impact on the surrounding uses. **Id.**

55.     The proposed use is consistent with the Arena District's Community Plan, which designates the site as "Mixed Use." **Id.**

56.     Under San Antonio Unified Development Code Section 35-421, the factors which must be considered for approval of a zoning amendment are:

> **a. Consistency.** The city council does not, on each rezoning hearing, redetermine as an original matter, the city's policy of comprehensive zoning. The city's zoning map shall be respected and not altered for the special benefit of the landowner when the change will cause substantial detriment to the surrounding lands or serve no substantial public purpose.
>
> **b. Adverse Impacts on Neighboring Lands.** The city council shall consider the nature and degree of an adverse impact upon neighboring lands. Lots shall not be rezoned in a way that is substantially inconsistent with the uses of the surrounding area, whether more or less restrictive. Further, the city council finds and determines that vast acreages of single-use zoning produces uniformity with adverse consequences such as traffic congestion, air pollution, and social alienation. Accordingly, rezonings which promote mixed uses subject to a high degree of design control are not necessarily deemed to be inconsistent with neighboring lands and shall be considered.

**c. Suitability as Presently Zoned.** The city council shall consider the suitability or unsuitability of the tract for its use as presently zoned. This factor, like the others, must often be weighed in relation to the other standards, and instances can exist in which the use for which land is zoned may be rezoned upon proof of a real public need or substantially changed conditions in the neighborhood.

**d. Health, Safety and Welfare.** The amendatory ordinance must bear a substantial relationship to the public health, safety, morals or general welfare or protect and preserve historical and cultural places and areas. The rezoning ordinance may be justified, however, if a substantial public need exists, and this is so even if the private owner of the tract will also benefit.

**e. Public Policy.** A strong public policy in favor of the rezoning may be considered. Examples include a need for affordable housing, economic development, or mixed-use development which functionally relates to the surrounding neighborhoods.

**f. Size of Tract.** The city council shall consider the size, shape and characteristics of the tract in relation to the affected neighboring lands. Amendatory ordinances shall not rezone a single city lot when there have been no intervening changes or other saving characteristic. Proof that a small tract is unsuitable for use as zoned or that there have been substantial changes in the immediate area may justify an amendatory ordinance.

**g. Other Factors.** The city council may consider any other factors relevant to a rezoning application under Texas law.

57.     No single factor is controlling. Instead, each must be weighed in relation to the other standards. Sec. 35-421(f).

### *The City's Political Opposition to the Church's Shelter*

58.     Upon submitting its zoning request to the City, the Church was surprised to encounter vocal opposition to its proposition to provide shelter and care for the migrant children.

59.     Unfortunately, the majority of opposition has come in the form of false statements and political grandstanding.

60.     First, some City politicians have mistakenly, or intentionally, labeled the shelter a "detention center," in an inexplicable attempt to tie the Church to the immigration policies of President Donald Trump.

61.     Whatever the reason for this mis-labeling, the Church seeks to shelter immigrant children on their Property.  It would not be a detention facility. Rather, the Church's shelter would provide a safe and less restrictive alternative to detention facilities. **Exhibit 3, ORR Fact Sheet.**

62.     Of the Church's proposed use of its property, San Antonio Mayor Ron Nirenberg stated: "The City will not be an accomplice to establishing another for-profit facility that will detain migrant children indefinitely as the humanitarian crisis at the border continues unresolved." **Exhibit 8, 10/23/19 Rivard Article.**

63.     Not only do the Mayor's comments wrongly attempt to recast the Church's religious convictions, he misstates factual reality. The stay of the children at the Church's shelter would be capped at 90 days, which is hardly "indefinitely."

64.     The Mayor's claim that denying the Church's religious exercise of ministering to the children would impact the situation at the border further ascribes false political motivations to a church motivated by its religion to care for immigrant children without a home.

65.     City Councilman Manny Peleaz claimed that the Church wants to "operate a prison where poor people's babies will be held against their will[.]" **Exhibit 8, 10/23/19 Rivard Article.**

66.     Again, not only is this statement factually untrue, it appears designed to inflame public opinion against the Church's religious exercise of ministering to the children by conflating it with political policies the church, and the denomination with which it is affiliated, roundly denounces.[4]

67.     City Councilwoman Jada Andrews-Sullivan has stated that "Humanitarian work is a wonderful part of ministry, but is not for a profit[.]" **Exhibit 9, 10/23/19 Express Article.**

---

[4] *See* Progressive National Baptist Convention 2019 Resolution, https://www.pnbc.org/assets/uploads/2019/10/2019-PNBC-Resolutions.pdf ("***Be it resolved***, that the Progressive National Baptist Convention denounces the xenophobia of the Trump Administration while insisting that Congress pass comprehensive immigration reform;") (emphasis added).

68.     Such comments advocate for discrimination against the Church's ministry simply because it would be paid for the use of its facilities, implying that the Church's religious exercise is somehow illegitimate and stands in contrast to the Church's denominational position that "all immigrants are our brothers and sisters in Christ, they are God's children and we seek to demonstrate to them the love of Christ in tangible ways" which requires pastors and churches "to address immigration issues with their members and other local churches so that we might be able to advocate on behalf of the immigrant community." *See supra*, footnote 4.

69.     Further, County Commissioner Tommy Calvert, angered that the Church did not lease the Property to his hand-picked entity, has made numerous false, discriminatory, and inflammatory statements about the Church and its ministry.

70.     Mr. Calvert stated "The children in VisionQuest custody are not free to practice their religion at their home churches, in their own language, and with their families while in custody of VisionQuest." **Exhibit 9, 10/23/19 Express Article.**

71.     Mr. Calvert has also alleged that child abuse may happen at the shelter, **Exhibit 10, 10/1/19 Express Article.**

72.     These inflammatory comments are intended to taint the review process and stem from the Church's decision to not rent out its Property to another entity hand-picked by Calvert, who is infuriated that God has led the Church in a direction that does not benefit him politically. **See Exhibit 10, 10/1/19 Express Article.**

73.     As shown above, the politicians of San Antonio have tainted the review process of the Church's simple zoning request, unfairly ascribing political and theological positions upon the church that are contrary, and morally offensive, to the Church, in an effort to halt the Church's religious exercise on political and discriminatory grounds.

74.     Further, the Church intends to not only instruct the children sheltered in their facility according to their Christian faith, but provide access to chaplains from various religious traditions, including Catholic and Islamic chaplains.

### *The Zoning Commission Recommends Denial*

75.     On November 5, 2019, the San Antonio Zoning Commission held a public hearing regarding the Church and VisionQuest's zoning request. **Exhibit 11, Agenda.**

76.     The Church had, on or about October 22, 2019, advised the City that a denial of the Church's rezoning request would substantially burden the Church's religious exercise. **Exhibit 12, Letter to City Attorney.**

77.     Neither of the surrounding neighborhood associations expressed opposition to the shelter. In fact, the Coliseum Willow Park Neighborhood Association is in support of the shelter. **Exhibit 13, Zoning Commission Minutes.**

78.     The City Development Services Staff Memo indicates that many of the hard land-use and planning factors favored approval of the zoning request. **Exhibit 14, Staff Memo.**

79.     Specifically, the Church's requested change to C-2 zoning was consistent with the City's Master Plan for future land use. **Id.**

80.     Staff also found that the C-2 zoning was "appropriate for the surrounding area." **Id.**

81.     Staff also found that the size of the Church's Property was sufficient to accommodate the shelter use. **Id.**

82.     In fact, when the staff memo is reviewed carefully, the only planning and land use factor identified by the staff in favor of denial was the proximity of a commercial use next to nearby residential parcels. **Id.**

83.     This same concern is repackaged and repeated for several of the analysis factors. **Id.**

84.     The recommendation of denial is oddly self-contradictory as staff indicates that the intent of the City is to have the Property be mixed or commercial use in the future, as the Property is ideally suited for it. But unless the City proposes to tear down all the surrounding residential properties, the "concern" regarding proximity to those residential properties will exist for any future use. **See Id.**

85.     Despite acknowledging the appropriateness of the Property for the shelter use and the requested zoning, staff recommended denial. **Id.**

86.     Many individuals attended the hearing to speak both in support of and in opposition to the shelter. **Exhibit 13, Zoning Commission Minutes.**

87.     At the hearing, much of the discussion focused on political issues and grievances rather than land use and planning issues or even the base recognition of the Church's right to use its property to carry out its religious mission. **Exhibit 15, 11/5/19 Rivard Article.**

88.     The discussion that did involve land use and planning centered on the proximity of the Property to residential uses, despite the inconsistencies of that position with the City's Master Plan for future land use. **Id.**

89.     Commissioner Patricia Gibbons cautioned her colleagues against making a land use decision based on politics. Nonetheless, her warning went largely unheeded. **Id.**

90.     Ultimately, the Commission recommended denial of the zoning request by a vote of 8-3.

### *The City Council Denies the Zoning Request*

91.     On December 5, 2019, the San Antonio City Council considered the Church and VisionQuest's zoning request at its weekly meeting.

92.     At the meeting, much of the opposition focused on the immigration policies of the federal government, and not the land use and planning aspects of the rezoning request.

93.     Ultimately, the City Council voted to deny the rezoning request.

### *The City Has Approved Numerous Secularly Owned Shelters*

94.     Despite the denial of the Church's shelter, the City has approved other shelter uses, some of which are adjacent to residential uses.

95.     There are at least six (6) migrant children shelters already operating in the City, at least one of which is operated by Southwest Key Programs, a secular organization. There are at least three (3) shelters operated by BCFS Health and Human Services, which upon information and belief is a nonreligious organization. A number of these shelters are near or adjacent to residential uses.

96.     Further, there is at least one homeless shelter approved by the City and adjacent to residential uses.

97.     On November 7, 2019, the San Antonio City Council approved a rezoning request to accommodate a human services campus at 4701 Dietrich Road. **Exhibit 16, Dietrich Road Agenda Item.**

98.     The Dietrich Road use was for a low-income housing project with associated services such as laundry. **Id.**

99.     Notably, City staff and the Zoning Commission recommended a zoning change to C-3 commercial despite the fact that the Dietrich Road property was adjacent to residential

property on the South and West Sides. **Id.** The City Council approved the Dietrich Road shelter on November 7, 2019. **Exhibit 17, City Council Minutes 11/7/2019.**

100.    The City's denial of the Church's shelter and approval of other secularly owned shelters amounts to treatment on less than equal terms when compared with similarly situated secular comparators, including but not limited to the Dietrich Road Property.

101.    As a result of the City's denial of the Church and VisionQuest's zoning request, the Church is now barred from following God's mandate to use its Property for its religious ministry. Pursuant to San Antonio Unified Development Code Section 35-491(c)(2), the Church faces daily fines of at least $100 if it follows its religious convictions for the Property. Its religious exercise has therefore been substantially burdened.

## COUNT I
### *Violation of the Religious Land Use and Institutionalized Persons Act*
### *Substantial Burden Claim - 42 U.S.C. § 2000cc(a)*

102.    Plaintiff restates the allegations in paragraphs 1 through 101 as if fully rewritten herein.

103.    Congress provided in Section 2(a)(1) of RLUIPA statutory protections for "religious exercise" as follows:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution * * * is in furtherance of a compelling government interest [and] is the least restrictive means of furthering that compelling government interest. 42 U.S.C. § 2000cc(a)(1).

104.    While Congress did not define the term "substantial burden" in RLUIPA, Congress defined "religious exercise" to broadly include:

> any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and specifies that the "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of

the person or entity that uses or intends to use the property for that purpose. 42 U.S.C. § 2000cc-5(7).

105.    Congress further directed that RLUIPA should be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

106.    In addition, RLUIPA's drafters noted the need for religious institutions to have the ability to develop "a physical space adequate to their needs and consistent with their theological requirements," which is at the heart of RLUIPA's land use provisions. 146 CONG. REC. S7774-01, 7774 (daily ed. July 27, 2000) (Joint Statement of Sen. Hatch and Sen Kennedy on the Religious Land Use and Institutionalized Persons Act of 2000).

107.    The "substantial burden" provision of RLUIPA applies when (1) the burden is imposed in a program that receives federal financial assistance; (2) the imposition or removal of the burden affects interstate commerce; or (3) the burden is imposed in a system in which a government makes individualized assessments about how to apply a land use regulation. 42 U.S.C. § 2000cc(a)(2)(A), (B), and (C).

108.    Under the Fifth's Circuit's interpretation of RLUIPA, a government places a "substantial burden" on a religious institution when it pressures the adherent to modify his religious behavior and significantly violates his religious beliefs. And, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs. *Adkins v Kaspar*, 393 F.3d 559 (5th Cir. 2004).

109.    The City has applied its Unified Development Code in a manner that substantially burdens the Church's religious exercise since the Church is now banned from using its Property to

follow God's mandate to provide a shelter for unaccompanied migrant children and to minister to and evangelize the children.

110.    The City's denial has forced the Church to significantly violate its religious beliefs generally and specifically. The Christian faith generally requires its adherents to care for the poor, needy, and children in particular. Specifically, the Church and its congregation have been called by God due to their unique location, facilities, and resources, to use the Property as a shelter for these unaccompanied migrant children. The Church will also conduct outreach and evangelistic activities with the children. The City's denial forces the Church to violate its mandate.

111.    The City has engaged in an individualized assessment through its analysis and denial of the requested zoning change and also by the decision to interpret the City's Unified Development Code in such a manner as to not allow the shelter use by right.

112.    The City has thus imposed a "substantial burden" on the Church's religious exercise as set forth in 42 U.S.C. 2000cc(a)(1).

113.    There are no practical alternatives for the Church's mandate to use its Property as a shelter for the unaccompanied migrant children and to minister to those children.

114.    The City's denial and imposition of the substantial burden was not the least restrictive means of furthering a compelling government interest.

115.    There is no compelling government interest supporting the City's denial.

116.    Even if there was a compelling government interest to support the City's denial, outright denial was not the least restrictive means of furthering that interest since alternative paths were available to the City.

117.    Accordingly, the City has imposed a "substantial burden" on the Church's rights by denying it the ability to use the Property as a shelter as recognized under 42 USC § 2000cc(a)(1).

118.    As a direct result of the Defendant's violations of the Church's rights protected under 42 USC § 2000cc(a), the Church has suffered damages in excess of $75,000.00.

119.    As a direct result of the City's denial, the Church has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT II
### Violation of the Texas Religious Freedom Restoration Act
### TEX. CIV. PRAC. & REM. CODE § 110.003 et seq

120.    Plaintiff restates the allegations in paragraphs 1 through 119 as if fully rewritten herein.

121.    The Texas Religious Freedom Restoration Act ("TRFRA") prohibits government entities like the City from "substantially burden[ing] a person's free exercise of religion," unless the government can demonstrate that the burden is the "least restrictive means" of furthering a "compelling governmental interest." Tex. Civ. Prac. & Rem. Code § 110.003(a)–(b).

122.    Notably, when interpreting the federal Religious Freedom Restoration Act, the Supreme Court said "RFRA was designed to provide very broad protection for religious liberty," and protects individuals and businesses alike. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2767–69 (2014).

123.    The Fifth Circuit has adopted the following test to determine if there has been a violation of TRFRA: (1) whether the government's regulations burden the plaintiff's free exercise of religion; (2) whether the burden is substantial; (3) whether the regulations further a compelling

governmental interest; and (4) whether the regulations are the least restrictive means of furthering that interest. *Merced v. Kasson*, 577 F.3d at 578 (5th Cir. 2009).

124.    The City, through its interpretation of the Unified Development Code and its denial of the zoning request, has substantially burdened the Church's religious exercise because it has prevented the Church from following God's mandate to use the Property as a shelter for the unaccompanied migrant children and to provide ministry and outreach to those children.

125.    There are no available alternatives for the Church to use the Property as a shelter for the unaccompanied migrant children and to minister to those children.

126.    The City's imposition of the substantial burden on the Church's religious exercise is not the least restrictive means of furthering any compelling government interest.

127.    Accordingly, the City has violated TRFRA.

128.    As a direct result of the Defendants' violations of the Church's rights protected under TRFRA, the Church has suffered damages in excess of $75,000.00.

129.    As a direct result of the City's denial, the Church has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

### COUNT III
*Violation of the Religious Land Use and Institutionalized Persons Act*
*Equal Terms Claim - 42 U.S.C. § 2000cc(b)(1)*
*As-Applied Challenge*

130.    Plaintiff restates the allegations in paragraphs 1 through 129 as if fully rewritten herein.

131.    The Equal Terms provision of RLUIPA states: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

132.    While the Fifth Circuit has yet to decide an *as-applied* Equal Terms claims, a facial claim under RLUIPA's Equal Terms clause requires a court to determine; (1) the regulatory purpose or zoning criterion behind the regulation at issue, as stated explicitly in the text of the ordinance or regulation; and (2) whether the religious assembly or institution is treated as well as every other nonreligious assembly or institution that is "similarly situated" with respect to the stated purpose or criterion. Where…the religious assembly or institution establishes a prima facie case, the government must affirmatively satisfy this two-part test to bear its burden of persuasion on this element of the plaintiff's Equal Terms Clause claim. *Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279, 292–93 (5th Cir. 2012).

133.    RLUIPA…is less concerned with whether formal differences may be found between religious and non-religious institutions—they almost always can—than with whether, in practical terms, secular and religious institutions are treated equally. *Third Church of Christ, Scientist v. City of N.Y.*, 626 F.3d 667 (2d Cir. 2010).

134.    The Church is a religious assembly or institution who is subject to a land use regulation—the San Antonio Unified Development Code.

135.    Accordingly, the first two prongs of the Equal Terms provision of RLUIPA have been met.

136.    The City has treated the Church's request to operate the shelter on less than equal terms as compared to similarly situated nonreligious shelters.

137.    There are nonreligious homeless shelters and migrant shelters located near or adjacent to residential areas that have been permitted in the City.

138.    The nonreligious shelters, including but not necessarily limited to the Dietrich Road shelter, the BCFS Health and Human Services migrant shelters, and the Southwest Key Program

migrant shelter, are similarly situated to the Church's proposed shelter in that these shelters qualify as "human services campuses" under the San Antonio Unified Development Code as interpreted by the City, at least some of these shelters are located near or adjacent to residential uses, and these shelters all conduct substantially similar if not identical operations as the Church's proposed shelter.

139.    The Church has not been treated equally with the permitted nonreligious shelters in the City with respect to the regulatory purpose or zoning criterion under the San Antonio Unified Development Code because the shelters identified herein have received zoning and land use approval from the City while the Church's proposed shelter was denied.

140.    Further, the Church has not been treated equally with similarly situated nonreligious shelters in that the other shelters' zoning and land use approval processes were not marred by the political grandstanding and misinformation that characterized the Church's approval process.

141.    Therefore, the City has violated RLUIPA's Equal Terms provision.

142.    The Church is suffering irreparable harm for which there is no adequate remedy at law and as a direct result of the Defendant's violations of Plaintiff's rights under RLUIPA's Equal Terms Clause, 42 U.S.C. § 2000cc(b)(1), as alleged above.

143.    Furthermore, as a direct result of the City's violations of the Church's rights under RLUIPA's Equal Terms provision as alleged above, Plaintiff has suffered and is entitled to recover damages, equitable relief, costs and attorney fees.

**COUNT IV**
*Violation of the Fair Housing Act*
*42 U.S.C. 3601 et seq.*

144.    Plaintiff restates the allegations in paragraphs 1 through 143 as if fully restated herein.

145.    The Fair Housing Act makes it unlawful to refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, religion, national origin, familial status, and/or handicap. 42 U.S.C. § 3604(a).

146.    "The Fair Housing Act is 'broad and inclusive' in protecting against conduct which interferes with fair housing rights and is subject to 'generous construction.'" *Texas v. Crest Asset Mgmt., Inc.*, 85 F. Supp. 2d 722, 727 (S.D. Tex. 2000).

147.    The phrase "otherwise make unavailable" has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions. *See, e.g., Huntington Branch, National Association For the Advancement of Colored People v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir.), *aff'd*, 488 U.S. 15, 102 L. Ed. 2d 180, 109 S. Ct. 276 (1988) (per curiam).

148.    The City's actions have made the shelter unavailable to the unaccompanied migrant children because of the Church's religious status and the children's race and national origin.

149.    The City's actions are the result of discriminatory intent against the Church as a religious organization and against the children as unaccompanied migrants.

150.    Further, the City's actions have resulted in disparate impact on the Church and the unaccompanied migrant children.

151.    The City's discriminatory intent can be clearly seen through the many bigoted and inflammatory comments by City officials as cited above.

152.    The City's discriminatory intent was a significant factor in the position taken by the City decision-makers in this case.

153.    The disparate impact upon the Church and unaccompanied migrant children was a predictable result of the City's denial of the zoning request for the Church's shelter.

154.    The City has therefore violated the Fair Housing Act by denying the Church and VisionQuest's zoning request to operate the shelter.

155.    The Church is suffering and will continue to suffer irreparable harm as direct result of the City's action.

156.    As a direct result of the City's violations of the Fair Housing Act as alleged above, Plaintiff has suffered and is entitled to recover damages, equitable relief, costs and attorney fees.

### Prayer for Relief

WHEREFORE, Plaintiff Second Baptist Church prays for a judgment against Defendant City of San Antonio, and that this Honorable Court:

   a.   Allow the Church to use its Property for a shelter for unaccompanied migrant children starting immediately;

   b.   Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declaration shall have the force and effect of final judgment and that the Court retains jurisdiction of this matter for the purpose of enforcing the Court's Order;

   c.   Award damages to the Church in excess of $75,000.00;

   d.   Pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000cc-4(d), and other applicable law, award the Church its reasonable attorney fees and costs; and

   e.   Grant such other and further relief, as the Court deems equitable, just and proper.

### Demand for Trial by Jury

Plaintiff herein demands a trial by jury in this cause of action.

Respectfully Submitted,

**Dalton & Tomich PLC**


By: ___/s/ Daniel P. Dalton_____
Daniel P. Dalton (Michigan Bar No. 44056)
Lawrence Opalewski (Michigan Bar No. 77864) (*Pro Hac Vice*)
Alexander R. Reuter (Michigan Bar No. 80654) (*Pro Hac Vice*)
Lead Attorneys for Plaintiff
The Chrysler House
719 Griswold Street, Suite 270
Detroit, MI 48226
Tel. (313) 869-6000
ddalton@daltontomich.com
lopalewski@daltontomich.com
areuter@daltontomich.com

and

**FORD/MURRAY, PLLC**

By: ___/s/ S. Mark Murray_____
S. MARK MURRAY
State Bar No. 14729300
10001 Reunion Place, Suite 640
San Antonio, Texas 78216
(210) 731-6400 Telephone
(210) 731-6401 Facsimile
MMurray138@aol.com


Dated: April 24, 2020

**Verification**

Pursuant to 28 U.S.C. §1746, I, The Rev. Dr. Robert L. Jemerson of Second Baptist Church,
declare under penalty of perjury, that I have personal knowledge of matters contained in
paragraphs 1, 7 through 20, 22, 28, 30-31, 33, 37-38 of this Complaint and that the allegations
contained therein are true and accurate.

Executed this this ___24 April 2020___

By: The Rev. Dr. Robert L. Jemerson
Its: Senior Pastor